# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### COLUMBIA DIVISION

| | | |
|---|---|---|
| BORIS SHULMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:07-2967-CMC-JRM |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| BLUE CROSS BLUE SHIELD OF | ) | |
| SOUTH CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff, Boris Shulman ("Shulman") filed his *pro se* complaint on August 29, 2007. He alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), Plaintiff claims that his employer, Blue Cross Blue Shield of South Carolina ("BCBS"), discriminated against him based on his race and national origin and retaliated against him because he complained about the alleged discrimination. BCBS filed a motion for summary judgment on September 6, 2008. Because Shulman is *pro se*, an order pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was issued on September 8, 2008. Shulman filed his response on October 15, 2008. BCBS filed a reply on October 27, 2008. Shulman also filed a motion for summary judgment on September 8, 2008. BCBS filed a response on October 15, 2008. Shulman filed a reply on October 27, 2008.

**Miscellaneous Motion**

On June 30, 2009, Shulman filed a motion to prevent a non-party, the South Carolina Human Affairs Commission ("SCHAC"), from destroying any portion of the file compiled in connection with its investigation of his charges of discrimination. SCHAC filed an opposition memorandum on July

14, 2009.  Shulman filed a reply on July 23, 2009.

Shulman's motion seems to be a continuation of his efforts to show that BCBS exerted undue influence over SCHAC, which led to its finding that based on its investigation, there was "no cause" to believe that he suffered discrimination.  On June 9, 2008, the undersigned granted SCHAC's motion to quash a subpoena directed at it by Shulman.  SCHAC also notified Shulman that under its retention policy his file would be destroyed three (3) years after he received the "no cause" notice.  Essentially, Shulman wants this court to enjoin SCHAC from following its normal policy.

Title VII by its terms confers authority to grant equitable relief as well as damages, but that authority relates to the parties to the action.  SCHAC is not a party to this case, and this Court lacks jurisdiction over it.  Further, principles of federalism limit the scope of a federal court's power to intervene in the internal operations of state or local agencies.  Rizzo v. Goode, 423 U.S. 362 (1976).

## Standard for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  *Id.*  Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues.  Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987).  This does not mean that summary judgment is never appropriate in these cases.  To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Id.* (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "Genuineness means that the evidence must

create fair doubt; wholly speculative assertions will not suffice." <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." <u>Id.</u> at 718-19 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." <u>Baber v. Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. <u>Id.</u> and <u>Doyle v. Sentry Inc.</u>, 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [*see* Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. <u>Baber</u>, citing <u>Celotex Corp.</u>, <u>supra</u>. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." <u>Mitchell v. Data General Corporation</u>, 12 F.3d 1310, 1316 (4th Cir. 1993) and <u>DeLeon v. St. Joseph Hospital, Inc.</u>, 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547 (5th Cir. 1987) and <u>Evans v. Technologies Applications & Services Co.</u>, 875 F. Supp. 1115 (D.Md. 1995).

When both parties file motions for summary judgment, as here, the court applies the same

standards of review. <u>Taft Broad. Co. v. United States</u>, 929 F.2d 240, 248 (6th Cir.1991); <u>ITCO Corp. v. Michelin Tire Corp.</u>, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment-even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." <u>Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.</u>, 627 F.Supp. 170, 172 (D.Md.1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." <u>Nafco Oil & Gas, Inc. v. Appleman</u>, 380 F.2d 323, 325 (10th Cir.1967); *see also* <u>McKenzie v. Sawyer</u>, 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion.").

### Facts

The record in this case is voluminous. BCBS's motion for summary judgment is supported, in part, by an affidavit of Johnny Davis ("Davis") who was Shulman's supervisor during a large part of the relevant time frame. ("Davis Aff., ¶ __"). Also attached is Shulman's deposition ("Pl.Dep., ___") and exhibits thereto ("Pl.Dep., Ex.__"). Shulman has filed his own affidavits in support of his motion for summary judgment ("Pl. Aff., ¶ __") and in opposition to BCBS's motion for summary judgment (Pl.Opp.Aff., ¶ __"). Shulman has also submitted a number of confidential exhibits

("Pl.Conf., Ex. __").[1]

The following facts are established by the record:

1. Shulman is a Russian who immigrated to the United States in 1995. He is white (Pl. Dep. 1).

2. Shulman has training and a background in computer programming/data processing. (Pl.Dep., 6-10).

3. Shulman began working for BCBS in February of 1999. (Pl.Dep., 13).

4. Shulman was interviewed and hired by Davis and Boyd Campbell ("Campbell") to work in BCBS's Inter-Plan Program Technologies Division ("IPPT") in September of 2003. (Pl.Dep., 13; Davis Aff., ¶ 2).

5. IPPT is a division of BCBS's Information Systems ("I/S") Department which maintains, changes, and augments a sophisticated computer system designed to automatically process insurance claims.

6. Shulman worked in the Production Support Group of IPPT. (Davis Aff., ¶ 2).

7. Initially, Davis was Shulman's manager. *Id.*

8. Shortly after Shulman arrived at IPPT, Mark Clelland ("Clelland") became his manager and Davis moved to the "release area" of IPPT. *Id.*

9. Jennifer Davis ("J. Davis") was Clelland's supervisor. Shulman had little direct contact with J. Davis other than training sessions and IPPT meetings. (Pl.Dep., 16-17).

_____

[1]The undersigned has reviewed the entire record in this case. Much of the information and documentation submitted by Shulman is inadmissible or unauthenticated. For instance, Shulman's affidavits contain conclusory statements, facts not within his personal knowledge, and hearsay. Shulman has also presented documents which appear to be his summaries of information, but may be BCBS business records. The undersigned has considered the whole record, but relied upon evidence which is clearly admissible in preparing this Report and Recommendation.

10. BCBS conducts an annual Performance Review ("PR") of its employees using a weighted numerical evaluation process in five sections:

    I.      Prior Review Development Plan/Results

    II.     Performance Objectives

    III.    Performance Behaviors/Skills

    IV.    Final Overall Rating

    V.     Current Review Development Plan

The employees' manager or supervisor evaluates the employee on a scale of 5-1 as follows:

    5     Consistently exceeds expectations

    4     Meets all expectations, sometimes exceeds expectations

    3     Meets expectations

    2     Needs improvement

    1     Below expectations

The PR process appears to seek to identify any performance problems and develop a plan for improvement which includes various classes the employee can attend for help in specific areas. The process requires a meeting between the evaluator and the employee, and a review by the evaluator's supervisor. Employee comments are solicited. (Pl.Dep., Ex. 2-5).

11. Shulman received his initial PR at IPPT in June of 2004. Clelland gave him an overall rating of 3.2 ("Meets expectations"). In the Performance Behavior/Skills section of the PR, Clelland rated Shulman as 2 in the section dealing with communication skills. Clelland commented: "Boris uses effective listening skills and communicates in a professional manner, but at times his oral communication skills fall short, primarily due to his accent.

Improvement in this area would help with his team members and managers." Clelland also commented that "Boris is a good addition to the IPPT team" and complimented him for his "solid work" on the INFORM project. In the Development Plan section of the PR, Clelland suggested that Shulman "(t)ake classes identified in career power such as 'Speak with confidence' and related courses." Shulman commented, "I am interested in taking Systems Analysis and Design class." The PR was reviewed by Clelland's supervisor J. Davis. (Pl.Mem., Ex. 2).

12. At the end of 2004 or the beginning of 2005, Jim Bienlein ("Bienlein") became Shulman's supervisor (Davis Aff., ¶ 2; Pl.Dep., 20). However, Bienlein was diagnosed with cancer, and most of Shulman's contact was with his team leader, Brian Webb. (Pl.Dep., p. 21).

13. According to Shulman, Tanya Dorsey ("Dorsey"), an African-American, was introduced as Director of IPPT in the fall of 2004, replacing J. Davis who became Senior Architect of the entire commercial system of BCBS. Shulman had almost no direct contact with Dorsey. (Pl.Dep., 37-38).

14. Shulman received his second PR at IPPT in July of 2005. Bienlein gave Shulman an overall rating of 2.4. The PR was reviewed by Bienlein's supervisor Renee McCormick. Bienlein commented that "Boris has not grown as much in this area as he should have. He has a basic understanding" of the business functions and inter-relationships at BCBS. In the Performance Behaviors/Skills section Shulman was rated as "Needing Improvement" in "Dependability," "Adaptability," and "Communications," and as "Below Expectations" in "Responsibility." With respect to Dependability, Bienlein commented that "Boris has had an unusually high number of 1 and 2 hour absences during the day. He has been spoken to

7

about this and I expect to see an improvement during the coming year." On Communications, Bienlein stated "Boris uses active listening skills, and communicates in a professional manner, but at times his oral communication skills fall short, primarily due to his accent. Improvement in this area would help his team members and managers. This has been brought to Boris' attention on many occasions and improvement does not seem to be forthcoming." Commenting on Responsibility, Bienlein stated "Boris does a good job of ensuring his team leader is aware of tasks being completed so more work can be assigned. However, Boris has been counseled for his excessive use of the telephone. I would expect to see an improvement in this area." In the Development Plan, Bienlein again suggested that Shulman "(t)ake classes identified in career power such as 'Speak with confidence' and related courses" as well as other technical classes. Shulman signed the PR without comment. (Pl.Dep., Ex. 3).

15. Shulman was "shocked" by his 2005 PR. (Pl.Dep., 41). He prepared a written rebuttal which he gave to Bienlein. He also met with HR Generalist Rhonda Midgette ("Midgette"), and gave her a copy of the rebuttal. It was at this time that Shulman raised the issue of national origin discrimination based on the comments relating to his accent in his 2004 and 2005 PRs. Midgette discussed the issues with management, and it was decided that Shulman would received a follow-up evaluation in 90 days. Midgette also advised Shulman that "if any of his absences were FMLA related, he needed to apply for FMLA leave with the benefits area within the human resources department. (Pl.Dep., 41-44; Pl.Opp.Aff., Ex. 12, ¶ C).

16. Bienlein performed the interim evaluation in November of 2006, giving Shulman an improved overall rating of 3.0. The PR comments repeated the criticism of unusually high 1 and 2 hour absences and the need for improved oral communication skills, but made no

mention of Shulman's accent.  The Development Plan again suggested that Shulman take the "'Speak with confidence' [class], or if not available 'Leading successful meetings' or 'Leading (Building) Successful Teams' and related courses." (Pl.Dep. Ex. 4).

17. In November of 2005, the BCBS "hotline" received a complaint accusing Dorsey of racism and favoritism, and that she directed employees to improperly charge work to different projects.  An investigation concluded that the anonymous complainer "does not like the changes [made by Dorsey] and does not like the director's management style.  However, there is no indication that the director is practicing racism or favoritism as described in the [hotline complaint]." (Pl.Conf., Ex.4).

18. Bienlein died in 2006 and Davis returned as Shulman's manager. (Pl.Opp.Aff., Ex. 12, ¶ D).

19. After Davis became Shulman's manager, they met and discussed the attendance issues, i.e., his frequent need to be out of the office ("OOO"). (Davis Aff., ¶ 3; Pl.Opp.Aff., ¶ C).

20. Shulman took advantage of Midgette's suggestion that he investigate Family Medical Leave Act ("FMLA") approval for his absences.  Human Resources approved Shulman for "intermittent leave of absence (LOA)" retroactive to May 22, 2006, and he was allowed to take "FMLA paid or unpaid leave" from that date and in the future. Medical certification was required.[2] (Pl.Opp.Aff., Ex. 5).

21. On the day before the 2006 PR, Davis and Shulman met.  Davis gave Shulman a written counseling memorandum concerning the need to improve his OOOs. (Davis Aff., ¶ 4; Pl.Opp.Aff., ¶ C).

---

[2]On February 2, 2007, Shulman notified Human Resources that he was no longer in need of FMLA leave.

22.    Davis completed Shulman's annual PR in June of 2006. (Pl.Dep., Ex. 5). It was reviewed by Dorsey. Shulman received an overall rating of 2.6. The only major negative ratings were related to Shulman's continued unscheduled absences. In the Performance Behaviors/Skills section of the PR, Shulman received a Below Expectations for Dependability, and Needs Improvement in Working with Others, Leadership/Influencing, and Responsibility. Davis' comments included: "(t)he problem is [Boris] has an excessive number of 1-3 hour absences. From August of last year through this May, Boris has been 000 49 times. This is an excessive number. He has been counseled about this and it must improve...The number of OOO's by Boris has not gone unnoticed by staff. This is the only problem area as Boris works well with everyone...The OOO's are not in the best interest of the company." Shulman was rated as Meets Expectations with respect to Communications. In connection with this rating Davis commented, "Boris has made progress with this in completing the class and making more of an effort to communicate with others in the area." Shulman did not sign the PR. (Pl.Dep., Ex. 5).

23.    Shulman was dissatisfied with his 2006 PR, and he prepared a written rebuttal dated June 29, 2006. He sent a copy to Midgette. (Pl.Opp.Mem., Ex. 4; Pl.Dep., Ex. 6). In this rebuttal Shulman stated his belief that "these ratings are unjustified, and do not reflect my real contribution and meanings which our Company puts in objectives that I was downgraded for." The rebuttal contained an explanation of his medical absences, including a complaint that his managers had not advised him of FMLA procedures. He alleged that he was a victim of national origin discrimination in his previous two PRs, and that his low 2006 PR was a result of retaliation for his complaints about the 2005 PR. (*Id.*)

24. Shulman, Davis, and Midgette met to discuss the continuing issue of OOOs. On August 2, 2006, Midgette sent Shulman and Davis an email memorializing the accord reached at the meeting:

> Boris, Johnny, per our meeting earlier this week, it is now clearly communicated and established that:
>
> Boris will give management 48 hours notice for all non-emergency medical appointments and planned absences by direct e-mail in addition to placing this leave on ETKS and his schedule.
>
> Boris will refrain from impromptu appointments "on-call" unless there is a medical emergency.
>
> Management will continue to monitor time away from work outside of approved FMLA leave and advise the employee accordingly.

(Pl.Dep., Ex. 7).

25. About the same time Shulman met with Davis and Midgette, he filed a charge of discrimination, dated July 20, 2006, with SCHAC alleging national origin discrimination and retaliation. (Pl.Dep., Ex. 8).

26. Shulman filed an amended charge of discrimination, dated October 20, 2006, in which he added a claim of race discrimination. (Pl.Dep., Ex. 9).

27. A "no cause" letter was issued by SCHAC on April 11, 2007.

28. After receiving his right- to- sue letter, Shulman requested and received a meeting with BCBS counsel and management to discuss his case and concerns. A result of this meeting was a Human Resources independent investigation, i.e., a "Perception Survey," of the Commercial Business Systems area to address Shulman's concern of race and national origin discrimination, retaliation, and hostile work environment.  Human Resource management "developed perception survey questions and diversified interviewees by race/ethnicity and

gender." After interviews of employees, Human Resources determined that Shulman's concerns were unsubstantiated. (Pl.Conf., Ex. 10).

29.   Shulman received an overall rating from Davis of 2.9 on his 2007 PR. It was noted that his number of OOO's had been reduced. Dorsey signed the PR as Davis' supervisor. Shulman wrote a comment expressing his disagreement with the PR. (Pl.Dep., Ex. 12).

30.   After receiving the 2007 PR, Shulman transferred from IPPT to a different department. (Pl.Dep., 150).

31.   Shulman filed another charge of discrimination with SCHAC, dated August 2, 2008, which alleged race and national origin discrimination as well as retaliation. In this charge Shulman alleges that "Dorsey initiated campaigns" against him. (Pl.Dep., Ex. 13).

## **Discussion**

Shulman alleges that he suffered discrimination because of his race and national origin while he was employed at IPPT. He also alleges retaliation because he complained about the discrimination. It is Shulman's contention that his PRs were based, not on his actual performance, but upon his race and national origin, and that those evaluations prevented him from "progressing" from his level at the time he was hired, ISE-4, to ISE-5, which would have resulted in higher pay.[3]

---

[3]According to BCBS policy, a portion of which is attached as Appendix 1 to Shulman's motion for summary judgment:

> Progression is the movement to the next level within a job family profile. Progression is a non-competitive process. An opening at a higher level is NOT necessary for an individual to move within their designated job family. Progressions are authorized when management determines that the individual is proficient at the skills and knowledge required of the next level and has demonstrated the desired behaviors

(continued...)

**1. Disparate Treatment**

In a disparate treatment case, such as this, Shulman must prove that "but for" his race or national origin, he would not have been subjected to an adverse employment action. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986). He can prove BCBS's motive to discriminate in one of two ways. First, Shulman "may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)." EEOC v. Clay Printing Co., 955 F.2d 936 (4th Cir. 1992).

Direct evidence is evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor...." Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), *cert. denied*, 454 U.S. 860 (1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds,* Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (evidentiary standard for mixed motive analysis).

The McDonnell Douglas proof scheme consists of three stages. Initially, the plaintiff must produce sufficient evidence to establish a prima facie case of discrimination. Gillins v. Berkeley Elec. Coop., Inc., 148 F.3d 413, 415 (4th Cir. 1998); Brinkley v. Harbour Recreation Club, 180 F.3d 598,

---

[3](...continued)
associated with the higher position. (Standardized progression matrices are under development for many of the job families). (emphasis in original).

607 (4th Cir. 1999). Next, if plaintiff succeeds in submitting evidence to the Court to establish his prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employment action taken. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). Last, once the defendant has satisfied this burden, it then shifts to plaintiff to prove the proffered reason is merely a pretext for discrimination. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

Shulman does not argue that he has produced direct evidence of race or national origin discrimination. In fact, he states that he is relying on the McDonnell Douglas scheme to establish his claims. (Pl.Opp.Mem., p. 6). Shulman generally argues that Dorsey discriminated against him and that "she used managers and team leaders as instruments of her will." (Pl.Dep., Ex. 14). Shulman has gone to great lengths to show that Dorsey favored African-Americans, especially those who belonged to the Greater Columbia Black Data Processors Association ("GCBDPA"), of which she was president. However, he has produced no admissible evidence to support his argument that his evaluators were compelled by Dorsey to rate him and other non-African Americans and non-American origin IPPT employees lower on PRs. On the other hand, BCBS argues that Shulman cannot establish a prima facie case of discrimination, and even if he could, it has articulated a legitimate, non-discriminatory reason for its decisions.

### a. Prima Facie Case

In order to establish a prima facie case of discrimination, Shulman must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse employment action he was performing up to BCBS's expectations; and (4) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.

Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

BCBS argues that Shulman has not shown that he suffered an adverse employment action, but only "criticism of his performance by Johnny Davis, an unbiased manager." (Def.Mem., 16). The undersigned disagrees.

Generally, "(a) poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment...[and] is actionable where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Thompson v. Potomac Electric Power Co., 312 F.3d 645, 652 (4th Cir. 2002), quoting Spears v. Missouri Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000). BCBS has not argued that its PR evaluation system does not effect an employee's progression, here from ISE-4 to ISE-5, which results in increased pay. Therefore, the undersigned concludes that for the purpose of summary judgment, Shulman's PRs detailed above may be considered adverse employment actions.

In order to establish the fourth prong of his prima facie case, Shulman would have to show that employees in the non-protected groups were treated more favorably with respect to their PRs. Shulman discusses at great length why he feels his scores were too low and why the scores of others were too high. However, he has produced little admissible evidence and relies on his opinion and the opinion of some other employees. The only evaluations in the record of comparators[4] named by Shulman are the 2005, 2006, and 2007 PRs of Tajma Lott ("Lott"). (Pl.Conf., Ex. 9). These PRs show that Lott was given a higher overall rating than Shulman in 2005 and 2006.[5] The undersigned

_____

[4]Shulman identified comparators in his response to BCBS's interrogatories.

[5]Lott actually received a lower overall PR rating than Shulman (2.7 versus 2.9) in 2007. Lott
(continued...)

concludes that Shulman has established a prima facie case of race and national origin discrimination with respect to his 2005 and 2006 PRs.

### b. Pretext

BCBS argues that it has offered a legitimate, non-discriminatory reason for Shulman being rated lower than Lott (and the other comparators), i.e., Shulman actually performed at a lower level. According to Davis, "(t)here is no comparison of the work load, work produced, and contributions of Boris Shulman as compared to Tajma Lott. Because Tajma was doing a very good job and was a good leader, I suggested that he be presented the opportunity to be the team lead. I would never have considered Boris Shulman for such a position; he has never shown himself to be qualified for a leadership roll." (Davis Aff., ¶ 11). Davis recommended and Lott received a bonus for his leadership roll on the Blue Link Idaho Project in 2005. He was team lead in 2005 and 2006.[6] (*Id.*). BCBS, by articulating its legitimate, non-discriminatory reason, shifts the burden to Shulman to show that "the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). Specifically, the plaintiff must "prove by a preponderance of the evidence that the 'legitimate reasons offered by the [employer] were not the true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). At this step,

---

[5](...continued)
was rated as "Needs Improvement" in the Performance Behaviors/Skills section of the PR in Dependability, Communicative, and Leadership/Influencing categories. The PR reflects that Lott had changed projects during the rating period and he conceded that he had "struggled." This conclusion assumes that Shulman and Lott were similarly situated for the purposes of summary judgment even though they held different job titles. Both were evaluated by Bienlein in 2005, but had different evaluators in 2006.

[6]As discussed above, Lott struggled after he changed projects in 2007. He is no longer employed by BCBS. (*Id.*)

the burden to demonstrate pretext has "merged with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination." <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981). Plaintiff can meet this burden by showing that the proffered reason is not factually accurate or by otherwise showing that it "is unworthy of credence." *Id.* Plaintiff can prove that the employer's articulated reason lacks credibility by showing that the employer has offered multiple or inconsistent justifications for its actions. <u>EEOC v. Sears Roebuck & Co.</u>, 243 F.3d 846, 853 (4th Cir. 2001).

It must be initially recognized that it is the employer's prerogative to establish criteria relevant to its employment decisions. "An employer can set whatever performance standards he wants provided they are not a mask for discrimination." <u>Smith v. American Nat'l Red Cross</u>, 980 F.2d 727, 1992 WL 357850, at *3 (4th Cir. 1992) (unpublished) (quoting <u>Palucki v. Sears, Roebuck & Co.</u>, 879 F.2d 1568, 1571 (7th Cir. 1989). Shulman does not argue that the rating system, evidenced by the criteria on the PR form, is in itself discriminatory. Indeed, the criteria used are logically related to the purpose of the PR, i.e., "to evaluate strengths and weaknesses in overall employee job performance by monitoring established objectives of performance standards." (Pl.Dep., Exs. 2-5). The goal of the PR is to "(e)ncourage continued successful performance and strengthen weakness through specific development planning." (*Id.*)

It must further be recognized that it is the employer's perception of job performance, and not the perception of the employee, co-workers, or others that is critical and controlling. <u>DaJarnette v. Corning, Inc.</u>, 133 F.3d 293 (4th Cir. 1998) and <u>Prince-Garrison v. Maryland Dep't of Health and Mental Hygiene</u>, 317 Fed.Appx. 351, 2009 WL 667421 (4th Cir. ).

Shulman essentially argues that his evaluators purposely underrated him. As discussed above,

the arguments primarily relate to his ratings involving his communication skills and his high number of OOOs. He generally continues the same arguments he made in his written rebuttals to his PRs. Shulman cannot show pretext because his arguments rest on his opinion of his performance and are not supported by the record.

### (1) Communication Skills

Shulman took English courses in Russia and after he arrived in the United States. (Pl.Dep., 52-53). He concedes that before he went to work for BCBS his English was not proficient, and he worked in volunteer jobs to help improve his speech. (Pl.Dep., 7). However, Shulman believes that by the time his 2004 PR was completed, his communication skills were "just adequate," but not "below" expectations. He does not know why Clelland downgraded his communication skills. (Pl.Dep., 49). Again, this assessment is Shulman's opinion.

Shulman worked in a team environment at IPPT with co-workers, team leads, and managers. BCBS determined that "communication" together with other "Performance Behaviors/Skills" was an important criteria for job performance for all the IPPT employees. In the 2004 PR, Bienlein noted this was an area in which Shulman needed to improve and suggested that he take "Speak with confidence" and related courses. Shulman did not think he needed the courses because they were not designed to improve his accent, so he did not take the courses. (Pl.Dep., 47-60).[7] Subsequently, PRs

---

[7]According to Shulman:

> I don't need like English second language not related to improving accent. I believe my communication in English is pretty good. As far as communicate, express myself what I want to express and understand, but like specifically to work with pronunciation, it's kind of one-on-one basis, I believe I don't need course, but I don't know. Maybe it's like tutoring or whatever. At least I am not familiar of the fact there are courses.

(continued...)

performed by Bienlein and other evaluators continued to address Shulman's communication skills and recommended that he take classes to address the issue. Finally, in the 2006 PR, Davis noted that Shulman had taken classes and had made progress in this area and made "more of an effort to communicate with others." (Pl.Dep., Ex. 5).

Thus the record demonstrates that when Shulman followed the PRs "Action Plan", took the classes offered by BCBS, and made an effort to improve, the evaluation of his communication skills likewise improved.

The thrust of Shulman's deposition, read as a whole, is that Dorsey used his managers to discriminate against him. He does not attribute discriminatory animus to the managers. This is relevant because the issue of the need for improved communication skills arose in the 2004 PR, before Dorsey became Director of IPPT.

### (2) OOOs

The issue of excessive OOOs initially arose in Shulman's 2005 PR. This was after Dorsey had become Director of IPPT. Bienlein rated Shulman as Needs Improvement in Dependability, noting that "Boris has had an unusually high number of 1 and 2 hour absences during the day." Bienlein indicated that he had spoken to Shulman about the problem and that he expected to see improvement. Bienlein did not include any remedial action in the Development Plan. (Pl.Dep., Ex. 3).

It was after the 2005 PR that Shulman initially approached Midgette and discussed FMLA with respect to his absences. The interim evaluation in November of 2006 was improved, but

[7](...continued)
(Pl.Dep., 54).

Bienlein again noted the high incidence to OOOs.

> The problem continued after Davis replaced Bienlein. According to Davis:
>
> > After Jim Bienlein died and Boris transferred to my group, Boris and I discussed the arrangement he had with Jim Bienlein, which was to notify Bienlein in his status report when he needed to be out the following week. I agreed to have Boris send me a reminder email notification when he needed to be out of the office "OOO"). It soon turned out, however, that Boris would make impromptu announcements that he had to leave for an appointment, or would say he was stressed or not feeling well and would go home.

(Davis Aff., ¶ 3; *see also* Pl.Dep. 67).

The issue was again addressed in the 2006 PR. Davis commented that from August of 2005 through

May of 2006 (i.e., the period between the 2005 and 2006 PRs) Shulman had forty-nine (49) OOOs.

He gave Shulman low scores for the Performance Behaviors/Skills criteria which were affected by

the OOOs. According to Davis:

> The problem with Shulman's absences was not necessarily his reason for taking the time off, but rather his changing his appointments on short notice. Paragraph 3 of Corporate Policy 65081 states that "Employees may request scheduled paid leave by giving their supervisors two work days (48 hours) of notice." Regular doctors and dentists appointments are usually arranged more than 48 hours in advance. Boris, however, often did not inform his management of his plans to be out until the last minute. He would claim his dentist or doctor just called, told him they could see him now, and he had to leave. There were also times when Shulman would say he was not feeling well and would go home.

(Davis Aff., ¶ 4).

During his deposition, Shulman conceded that this was a legitimate concern:

> The company discourages unscheduled leave. I understood it. Because in order to function as company, the employee should be reliable and unscheduled leaves like could create trouble for business. I understood it always, and I followed my management guidelines, so basically I allied to my manager.

(Pl.Dep., 79).

> Shulman returned to Midgette to complain about his 2006 PR. After a meeting of Shulman,

Davis, and Midgette, it was agreed that Shulman would give Davis 48 hours notice of all non-emergency medical appointments and planned absences, and that Shulman would refrain from unscheduled appointments absent a medical emergency. (Pl.Dep., Ex. 7).

The procedure seems to have been successful. Davis gave Shulman a higher rating on the 2007 PR and noted that "Boris has reduced the number of OOO's" over the past review period and he should continue at his current level or lower. (Pl.Dep., Ex. 12). Shulman completed his orthodontic and allergy treatments during the period so his need for medical appointments decreased. (Pl.Dep., 71-72).

Shulman does not appear to contest the fact that he had a relatively high number of OOOs. Instead, he argues that his reasons for taking the OOOs were legitimate,[8] and that the problem, if any, was caused because his managers failed to inform him of BCBS's FMLA policy. These arguments miss the point.

Davis' criticism was not that Shulman was absent, but that he was absent without giving sufficient notice for scheduling and to manage short term projects. There is no indication that BCBS denied him leave, and Midgette assisted him in obtaining LOA and in filing for FMLA leave. Thus, the issue of whether the OOOs were paid leave, unpaid leave, LOA, or FMLA leave is largely irrelevant to the issue addressed in the PRs.

### 2. Retaliation

Shulman asserts that BCBS retaliated against him because he engaged in protected activities. This claim is without merit.

---

[8]Shulman has produced records showing that he kept a number of doctor's appointments during the periods in question.

To establish a prima facie case of retaliation, it must be demonstrated that:

> (1) the employee engaged in protected activity;
>
> (2) the employer took some adverse employment action against the employee; and
>
> (3) a causal connection existed between the protected activity and the adverse action.

*See* Anderson v. G.D.C., Inc., 281 F.3d 452, 458 (4th Cir. 2002); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254. If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that the adverse action was imposed because the plaintiff engaged in protected activity. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Industries, Inc., 802 F.2d 746, *cert. denied*, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

The Fourth Circuit, in Von Gunten v. Maryland, 243 F.3d 858 (4th Cir. 2001), addressed what an "adverse employment action" is for purposes of a Title VII retaliation claim. Although "ultimate employment actions" are adverse employment actions, a Title VII retaliation claim does not require

an ultimate employment action. In <u>Burlington Northern & Santa Fe R.R. Co. v. White</u>, 548 U.S. 53, 60 (2006), the Supreme Court held that a plaintiff is not required to show "an adverse effect on the 'terms, conditions, or benefits' of employment" to support a retaliation claim (quoting <u>Von Gunten</u>, 243 F.3d at 866). It is sufficient if the plaintiff shows that a reasonable employee finds the employment action "materially adverse" or likely to "dissuade a reasonable worker from making or supporting a charge of discrimination." <em>Id.</em> at 57 (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Shulman engaged in protected activity when he complained to Midgette after his 2005 and 2006 PRs and when he filed his charges of discrimination with SCHAC. However, he cannot establish a prima facie case of retaliation because he has not shown that he suffered an adverse employment action.

Shulman's first protected activity occurred when he contacted Midgette to complain of national origin and race discrimination after he received an overall rating of 2.4 on his 2005 PR. The record shows that his overall ratings on PRs after his complaint were all higher than 2.4 and were within the "Meets Expectations" range.[9]

### Conclusion

Based on a review of the record, it is recommended that Plaintiff's miscellaneous motion and

---

[9]Even if Shulman could establish a prima facie case, the above pretext analysis of his disparate treatment claims would apply equally to his retaliation claim.

motion for summary judgment be **denied**, and that Defendant's motion for summary judgment be **granted**.

_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina

August 7, 2009

**The parties are referred to the Notice Page attached hereto.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).